1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **LUIS ALBERTO SALGADO,** | **Case No. 1:12-cv-00231 AWI MJS (HC)** |
| Petitioner, | **FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS** |
| **v.** | |
| **M.D. BITER,** | |
| Respondent. | |

Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent is represented by Charles A. French of the office of the California Attorney General.

**I.      PROCEDURAL BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Kern, following his conviction by jury trial on May 6, 2009, of attempted manslaughter, attempted robbery, assault with a firearm, unlawful possession of a firearm by a felon, and second degree robbery. (Lodged Doc. 1 at 1-2, Clerk's Tr. at 508-11.) On June 24, 2009, Petitioner was sentenced to an indeterminate term of thirty (30) years to life in state prison. (Id.)

Petitioner's direct appeal was denied by the California Court of Appeal, Fifth

1   Appellate District on November 30, 2010. (Lodged Docs. 1-4.) On January 4, 2011,

2   Petitioner filed a petition for review with the California Supreme Court. (Lodged Doc. 7.)

3   The petition was summarily denied on February 16, 2011. (Lodged Doc. 8.) Petitioner

4   then filed a petition for writ of habeas corpus with the Kern County Superior Court. It was

5   denied on February 7, 2012. (Lodged Docs. 5-6.)

6       Petitioner filed his federal habeas petition on February 17, 2012, and filed an

7   amended petition on June 26, 2012. (ECF Nos. 1, 13.) The amended petition serves as

8   the operative petition and raises two grounds for relief: 1) There was insufficient

9   evidence to support a finding of great bodily injury as it was not proven that the beating

10  or gunshot wound was a substantial cause of the victim's coma; and 2) Petitioner's right

11  to due process was violated when he fell and the jurors saw his shackles in the

12  courtroom. (Am. Pet., ECF No. 13.)

13      Respondent filed an answer to the amended petition on December 17, 2012, and

14  Petitioner filed a traverse on March 11, 2013. (Answer & Traverse, ECF Nos. 23, 27.)

15  The matter stands ready for adjudication.

16  **II.   STATEMENT OF THE FACTS**[1]

17      **FACTUAL SUMMARY**

18      During the early morning hours of December 27, 2007, Salgado
19  (also know as Beto), Juan Morales, and Luis Tamayo were driving the
    Morales family car, a brownish-colored Nissan Altima, in Bakersfield,
20  California. Jovany Gonzalez was dropping off newspapers when the
    Nissan stopped nearby. Salgado and Morales got out of the car and
21  approached Gonzalez. Morales was very drunk. Salgado pointed a gun at
    Gonzalez's head and demanded money. Tamayo stayed in the car.
22  Gonzalez gave Salgado his wallet and his cell phone before running away
    and calling police. Salgado told Gonzalez not to tell anyone or Salgado
23  would kill him.

24      A short while later another individual waiting for a light at a nearby
    location saw the Nissan Altima pull over and its three occupants jump out
25  and assault the second victim, Manuel Arrazate. The woman saw the men
    beating the victim and heard a gunshot. She called 911. Two of the
26  assailants were wearing dark bulky hooded jackets. One was wearing a

27  ─────────────
    [1]The Fifth District Court of Appeal's summary of the facts in its November 30, 2010 opinion is presumed
    correct.  28 U.S.C. § 2254(e)(1).

28

2

long white shirt. When police arrived at the scene, they found Arrazate conscious but not responsive. There were two gunshot holes in Arrazate's head. Arrazate was taken to the local trauma center where he ultimately went into a coma. Although initially the wounds to Arrazate's head appeared superficial, a CT scan revealed a metallic foreign body associated with "adjacent brain edema and subarachnoid hemorrhage as well as pneumocephalus." Arrazate remained in a coma and in intensive care for several days. He awoke on January 2 and was discharged on January 9.

The day after the assault on Arrazate, police were able to determine that Gonzalez's cell phone was being used at a specific location. Investigators went to the location and found Salgado, wearing jeans and a dark hooded sweatshirt, in possession of Gonzalez's cell phone. The investigation led police to the Morales family where they were able to ascertain from witnesses that Salgado, Tamayo, and the Morales brothers, Juan and Omar, had been together the evening of December 26 and that Salgado, Tamayo, and Juan Morales had taken the Nissan during the early hours of December 27. Juan was wearing a long white top that had blood on it and was still drunk when the police made contact with him.

Gonzalez identified Salgado, at trial and in a photo lineup, as the man with the gun during his robbery. Arrazate initially could not remember anything about the assault, but just before trial, after contact with Salgado, he claimed that Salgado was not the shooter. The citizen who witnessed the assault could not identify Salgado as the shooter but described the clothing the assailants were wearing and the car; her description was consistent with what police found when they arrested Salgado and Juan Morales. No weapon was ever found.

Tamayo was charged as a codefendant and testified against Salgado at trial. Tamayo said he stayed in the car during the first assault, which was consistent with Gonzales's testimony. Tamayo said he participated in the second assault, which was consistent with the citizen's report. Tamayo also said he heard the gunshot while he searched Arrazate for something to steal, although he testified at trial that he did not see a gun. Tamayo had told police that he thought Salgado had a gun because he had seen Salgado with a gun. Tamayo also said that, after Salgado returned to the car, he claimed the shooting was an accident.

People v. Salgado, 2010 Cal. App. Unpub. LEXIS 9538, 2-5 (Cal. App. 5th Dist. Nov. 30, 2010).

## II.   DISCUSSION

### A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the

3

1   conviction challenged arises out of the Kern County Superior Court, which is located

2   within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a). Accordingly, the Court

3   has jurisdiction over the action.

4         **B.**     **<u>Legal Standard of Review</u>**

5         On April 24, 1996, Congress enacted the Antiterrorism and Effective Death

6   Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus

7   filed after its enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320, 326 (1997); <u>Jeffries v. Wood</u>,

8   114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of

9   the AEDPA; thus, it is governed by its provisions.

10         Under AEDPA, an application for a writ of habeas corpus by a person in custody

11   under a judgment of a state court may be granted only for violations of the Constitution

12   or laws of the United States. 28 U.S.C. § 2254(a); <u>Williams v. Taylor</u>, 529 U.S. at 375 n.

13   7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in

14   state court proceedings if the state court's adjudication of the claim:

15        (1) resulted in a decision that was contrary to, or involved an
16        unreasonable application of, clearly established federal law, as
         determined by the Supreme Court of the United States; or

17        (2) resulted in a decision that was based on an unreasonable
18        determination of the facts in light of the evidence presented in the State
         court proceeding.

19   28 U.S.C. § 2254(d).

20           1.   <u>Contrary to or an Unreasonable Application of Federal Law</u>

21         A state court decision is "contrary to" federal law if it "applies a rule that

22   contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts

23   that are materially indistinguishable from" a Supreme Court case, yet reaches a different

24   result." <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005) citing <u>Williams</u>, 529 U.S. at 405-06.

25   "AEDPA does not require state and federal courts to wait for some nearly identical

26   factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that

27   even a general standard may be applied in an unreasonable manner" <u>Panetti v.</u>

28   <u>Quarterman</u>, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The

1   "clearly established Federal law" requirement "does not demand more than a 'principle'

2   or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009).  For a state

3   decision to be an unreasonable application of clearly established federal law under §

4   2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle

5   (or principles) to the issue before the state court.  Lockyer v. Andrade, 538 U.S. 63, 70-

6   71 (2003).  A state court decision will involve an "unreasonable application of" federal

7   law only if it is "objectively unreasonable."  Id. at 75-76, quoting Williams, 529 U.S. at

8   409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the

9   Court further stresses that "an *unreasonable* application of federal law is different from

10  an *incorrect* application of federal law."  131 S. Ct. 770, 785 (2011), (citing Williams, 529

11  U.S. at 410) (emphasis in original).   "A state court's determination that a claim lacks

12  merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

13  correctness of the state court's decision."  Id. at 786 (citing Yarborough v. Alvarado, 541

14  U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts

15  have in reading outcomes in case-by-case determinations."  Id.; Renico v. Lett, 130 S.

16  Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established

17  Federal law for a state court to decline to apply a specific legal rule that has not been

18  squarely established by this Court."  Knowles v. Mirzayance, 129 S. Ct. 1411, 1419

19  (2009), quoted by Richter, 131 S. Ct. at 786.

20              2.    Review of State Decisions

21        "Where there has been one reasoned state judgment rejecting a federal claim,

22  later unexplained orders upholding that judgment or rejecting the claim rest on the same

23  grounds."  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the

24  "look through" presumption.  Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198

25  (9th Cir. 2006).    Determining whether a state court's decision resulted from an

26  unreasonable legal or factual conclusion, "does not require that there be an opinion from

27  the state court explaining the state court's reasoning."  Richter, 131 S. Ct. at 784-85.

28  "Where a state court's decision is unaccompanied by an explanation, the habeas

1   petitioner's burden still must be met by showing there was no reasonable basis for the

2   state court to deny relief." Id. ("This Court now holds and reconfirms that § 2254(d) does

3   not require a state court to give reasons before its decision can be deemed to have been

4   'adjudicated on the merits.'").

5        Richter instructs that whether the state court decision is reasoned and explained,

6   or merely a summary denial, the approach to evaluating unreasonableness under §

7   2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments

8   or theories supported or, as here, could have supported, the state court's decision; then

9   it must ask whether it is possible fairminded jurists could disagree that those arguments

10  or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786.

11  Thus, "even a strong case for relief does not mean the state court's contrary conclusion

12  was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. at 75).  AEDPA "preserves

13  authority to issue the writ in cases where there is no possibility fairminded jurists could

14  disagree that the state court's decision conflicts with this Court's precedents." Id. To put

15  it yet another way:

16        As a condition for obtaining habeas corpus relief from a federal
        court, a state prisoner must show that the state court's ruling on the claim
17      being presented in federal court was so lacking in justification that there
        was an error well understood and comprehended in existing law beyond
18      any possibility for fairminded disagreement.

19  Id. at 786-87.  The Court then explains the rationale for this rule, i.e., "that state courts

20  are the principal forum for asserting constitutional challenges to state convictions." Id. at

21  787. It follows from this consideration that § 2254(d) "complements the exhaustion

22  requirement and the doctrine of procedural bar to ensure that state proceedings are the

23  central process, not just a preliminary step for later federal habeas proceedings." Id.

24  (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977).

25            3.    Prejudicial Impact of Constitutional Error

26        The prejudicial impact of any constitutional error is assessed by asking whether

27  the error had "a substantial and injurious effect or influence in determining the jury's

28  verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551

1    U.S. 112, 121-22 (2007) (holding that the <u>Brecht</u> standard applies whether or not the

2    state court recognized the error and reviewed it for harmlessness).  Some constitutional

3    errors, however, do not require that the petitioner demonstrate prejudice.  <u>See</u> <u>Arizona v.</u>

4    <u>Fulminante</u>, 499 U.S. 279, 310 (1991); <u>United States v. Cronic</u>, 466 U.S. 648, 659

5    (1984).  Furthermore, where a habeas petition governed by AEDPA alleges ineffective

6    assistance of counsel under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the

7    <u>Strickland</u> prejudice standard is applied and courts do not engage in a separate analysis

8    applying the <u>Brecht</u> standard.  <u>Avila v. Galaza</u>, 297 F.3d 911, 918, n. 7 (2002).  <u>Musalin</u>

9    <u>v. Lamarque</u>, 555 F.3d at 834.

10   **III.**    **REVIEW OF PETITION**

11       **B.**    **Claim One: Insufficient Evidence**

12       Petitioner claims that his due process rights were violated because there was

13   insufficient evidence to show that there was great bodily injury. (<u>See</u> Am. Pet.)

14           1..    <u>State Court Decision</u>

15       Petitioner presented this claim by way of direct appeal to the California Court of

16   Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

17   appellate court and summarily denied in subsequent petition for review by the California

18   California Supreme Court. (<u>See</u> Answer, Ex. A, Lodged Docs. 7-8.) Because the

19   California Supreme Court's opinion is summary in nature, this Court "looks through" that

20   decision and presumes it adopted the reasoning of the California Court of Appeal, the

21   last state court to have issued a reasoned opinion. <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S.

22   797, 804-05 & n.3 (1991) (establishing, on habeas review, "look through" presumption

23   that higher court agrees with lower court's reasoning where former affirms latter without

24   discussion); <u>see also</u> <u>LaJoie v. Thompson</u>, 217 F.3d 663, 669 n.7 (9th Cir. 2000)

25   (holding federal courts look to last reasoned state court opinion in determining whether

26   state court's rejection of petitioner's claims was contrary to or an unreasonable

27   application of federal law under 28 U.S.C. § 2254(d)(1)).

28       In denying Petitioner's claim, the California Court of Appeal explained:

**I. Insufficiency-of-the-evidence claim**

Salgado claims that there is insufficient medical evidence to support a finding that the gunshot wound resulted in the coma. He also argues that the jury's finding that he personally inflicted great bodily injury upon Arrazate by causing him to become comatose is not supported by the evidence. He takes the position that the medical records show the initial impressions of the attending physician were that Arrazate's condition was "'acute alcoholism'" and that he had a toxic level of alcohol in his system. Coupled with notations in the medical records that the initial wound was "'extracranial,'" i.e., superficial, and that the doctor noted he could not rule out a "'blast effect'" from the gunshot, Salgado claims there is no direct medical evidence that the gunshot wound caused the coma.

The infliction of a coma, whether permanent or not, is by legislative definition great bodily injury. (See People v. Galvan (2008) 168 Cal.App.4th 846, 855; People v. Tokash (2000) 79 Cal.App.4th 1373, 1378 [postsurgical coma for two months supports factual determination that defendant inflicted great bodily injury causing victim to become comatose due to brain injury under statutory definition].) The issue is whether Salgado's acts caused the coma.

The rules of appellate review require us to evaluate the evidence in the light most favorable to the respondent and presume in support of the judgment every fact a jury could have reasonably deduced from the evidence. (People v. Rayford (1994) 9 Cal.4th 1, 23; People v. Ochoa (1993) 6 Cal.4th 1199, 1206.) We must uphold the jury's finding if there is sufficient evidence to support each element of the enhancement alleged so that a reasonable juror could conclude that the enhancement is true beyond a reasonable doubt. (People v. Harris (2008) 43 Cal.4th 1269, 1286; People v. Morales (2003) 112 Cal.App.4th 1176, 1199.) It does not matter that facts and circumstances could reasonably have supported the opposite finding. (People v. Millwee (1998) 18 Cal.4th 96, 132; People v. Stanley (1995) 10 Cal.4th 764, 793.) "'It is the trier of fact, not the appellate court, that must be convinced of a defendant's guilt beyond a reasonable doubt.'" (People v. Sotelo (1971) 18 Cal.App.3d 9, 20.)

Section 12022.7, subdivision (b), mandates an additional, consecutive five-year term for a defendant who, under certain conditions, "personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony which causes the victim to become comatose due to brain injury or to suffer paralysis of a permanent nature" while committing or attempting a felony. Section 12022.7 does not define a separate offense, but rather is a legislative attempt to punish more severely those crimes that result in great bodily injury. (People v. Verlinde (2002) 100 Cal.App.4th 1146, 1168.) Likewise, section 12022.53, subdivision (d), mandates an additional and consecutive term of 25 years for a defendant who "personally and intentionally discharges a firearm and proximately causes great bodily injury, as defined in Section 12022.7 … to any person other than an accomplice …."

The enhancements apply whenever the defendant's personal discharge of a firearm is a proximate, substantial factor contributing to the resulting great bodily injury--a coma in this case. (See People v. Bland

(2002) 28 Cal.4th 313, 338; People v. Garcia (2002) 28 Cal.4th 1166, 1169.) The jury was told that it could find the enhancement allegation true only if it determined beyond a reasonable doubt that Salgado caused great bodily injury, specifically that Salgado's "acts caused Mr. Arrazate to become comatose due to a brain injury." After a careful reading of the record, we believe there is sufficient evidence to support the jury's finding that Salgado's acts caused Mr. Arrazate's coma.

The quotes from the medical records relied upon by Salgado**[FN2]** are extracted from the notes of one of several attending physicians, Dr. Jeffrey Oppenheimer, based on his evaluation of Arrazate at the time of admission. The doctor's notes describe the presenting injury as a "tangential gunshot wound to the left frontotemporal region with entrance and exit wounds …." The doctor further notes that a CT scan of the head, ordered immediately after admission, "demonstrates a very small rim epidural on the left with minimal mass effect, approximately 2 mm in size and some suggestion of decrease and some slight areas of possible swelling of the left hemisphere." The doctor notes that Arrazate's alcohol levels were "toxic" and stated under "Impression" that Arrazate suffered from "[a]cute alcoholism."**[FN3]** The doctor also mentioned under "Impression" that he could not "rule out a blast effect, increase in [Arrazate's] intracranial pressure."

> **FN2**. Salgado quotes from various parts of the medical record without citation to the record in violation of California Rules of Court, rule 8.204(a)(C). Arrazate's medical records were admitted into evidence as People's Exhibit 1. Exhibit 1 is a lengthy document containing a number of notes and reports generated at the hospital. The exhibit was not paginated in the trial court; however, a paginated copy of the exhibit should have been made a part of the appellate record, or some other method of citation should have been utilized. A party who relies on a given part of the appellate record to support a claim of error must provide adequate citation in order to point the court to the portions of the record relied upon. (ComputerXpress, Inc. v. Jackson (2001) 93 Cal.App.4th 993, 1011 [factual assertions in appellate briefs should be supported with specific cites to record]; Duarte v. Chino Community Hospital (1999) 72 Cal.App.4th 849, 856 [it is duty of party to support its arguments by appropriate reference to record, which includes providing exact page citations].)

> **FN3**. Salgado states, without citation, that, "[i]ndeed, the doctor listed the gunshot as a secondary possibility, with alcoholism rated as the most likely cause [of the coma]." We have read Dr. Oppenheimer's report and the remaining medical records from beginning to end and find no such statement. The emergency medical record lists the doctor's clinical impression as "1). Small left epidural hematoma. 2). Subarachnoid hemorrhage. 3). Alcohol intoxication." The neurosurgery service patient evaluation prepared on December 27 at 5:00 a.m., which appears handwritten and is signed by Dr. Oppenheimer, lists the clinical impressions as "GSW to head, [left] partial EDH/pneumocephalis. ETOH intoxication." These records suggest just the opposite of

Salgado's representations, i.e., that the focus was on the gunshot wound as the cause of the coma, not the alcohol intoxication.

This note was dictated by Dr. Oppenheimer most likely prior to or simultaneous with Arrazate's formal admission to the hospital, which occurred at 6:12 a.m. on December 27. We can determine the likely time of the notes because the doctor referred to one earlier CT head scan and then ordered a follow-up CT scan in six hours. There were three CT head-scan reports ordered on December 27 according to Arrazate's medical records. One was done at 3:54 a.m., one at 9:12 a.m., and one at 11:12 p.m. It thus appears that Dr. Oppenheimer's notes were written either between the first and second CT scans or less likely between the second and third CT scans. In any event, the notes relied upon were written very early in the diagnostic process.

The later CT scans show far more than a superficial wound. The CT scan for 9:12 a.m. found a "metallic foreign body in high convexity mid frontal lobe on the left side. This is associated with adjacent brain edema and subarachnoid hemorrhage as well as pneumocephalus." The 11:12 p.m. CT scan found a likely left side hemorrhage and brain edema. The report suggested that surgical intervention may be needed.

The remaining medical records address the need for neurosurgical follow up and document treatment to an injury to Arrazate's left hand. There is nothing in the records to suggest that the medical team believed the coma was the result of Arrazate's alcoholism. No treatment or evaluation of Arrazate's alcoholism is discussed other than the references found in the admission notes. Even the initial admission notes identify the principal diagnosis as a gunshot wound to the left forehead with a grazing injury and a subarachnoid hemorrhage to the frontal lobe. The secondary diagnosis given in these notes is "Hemiplegia" and a "5th finger [fracture]." An updated admission note identifies the principal diagnosis as a gunshot wound to the left forehead with a left frontal epidural hematoma.

Arrazate may have been very drunk when assaulted and may suffer from alcoholism. There is nothing, however, in the medical evidence presented at trial to suggest that alcohol was the cause of his coma. The medical records as a whole, including the notations about increased pressure, brain edema, and subcranial hemorrhaging, coupled with Arrazate's testimony that he suffered a coma, provide sufficient evidence to support the jury's finding that it was the gunshot wound inflicted by Salgado that caused Arrazate's coma.

Since there is sufficient evidence to support a finding that the gunshot wound caused the coma, there is also sufficient evidence to support a finding that Salgado's acts inflicted great bodily injury. Consequently, there is sufficient evidence to support the section 12022.7, subdivisions (a) and (b), enhancements of counts two and three.

People v. Salgado, 2010 Cal. App. Unpub. LEXIS 9538, 5-13 (Cal. App. 5th Dist. Nov. 30, 2010).

3.   Legal Standard - Sufficiency of the Evidence

When a challenge is brought alleging insufficient evidence, federal habeas corpus

1   relief is available if it is found that based on the evidence adduced at trial, viewed in the

2   light most favorable to the prosecution, no rational trier of fact could have found "the

3   essential elements of the crime" proven beyond a reasonable doubt. <u>Jackson v. Virginia</u>,

4   443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). <u>Jackson</u> established a two-

5   step inquiry for considering a challenge to a conviction based on sufficiency of the

6   evidence. <u>United States v. Nevils</u>, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc). First,

7   the court considers the evidence at trial in the light most favorable to the prosecution. <u>Id.</u>,

8   citing <u>Jackson</u>, 443 U.S. at 319. "'[W]hen faced with a record of historical facts that

9   supports conflicting inferences," a reviewing court 'must presume - even if it does not

10  affirmatively appear in the record - that the trier of fact resolved any such conflicts in

11  favor of the prosecution, and must defer to that resolution.'" <u>Id.</u>, quoting <u>Jackson</u>, 443

12  U.S. at 326, 99 S.Ct. 2781.

13       "Second, after viewing the evidence in the light most favorable to the prosecution,

14  a reviewing court must determine whether this evidence, so viewed is adequate to allow

15  '*any* rational trier of fact [to find] the essential elements of the crime beyond a reasonable

16  doubt.'" <u>Id.</u>, quoting <u>Jackson</u>, 443 U.S. at 319 (emphasis in original). "At this second

17  step, we must reverse the verdict if the evidence of innocence, or lack of evidence of

18  guilt, is such that all rational fact finders would have to conclude that the evidence of

19  guilt fails to establish every element of the crime beyond a reasonable doubt." <u>Id.</u>

20       Superimposed on these already stringent insufficiency standards is the AEDPA

21  requirement that even if a federal court were to initially find on its own that no reasonable

22  jury should have arrived at its conclusion, the federal court must also determine that the

23  state appellate court not have affirmed the verdict under the <u>Jackson</u> standard in the

24  absence of an unreasonable determination. <u>Juan H. v. Allen</u>, 408 F.3d 1262 (9th Cir.

25  2005); <u>see also</u> <u>Boyer v. Belleque</u>, 659 F.3d 957, 964 (9th Cir. 2011) ("Thus, when we

26  assess a sufficiency of evidence challenge in the case of a state prisoner seeking

27  federal habeas corpus relief subject to the strictures of AEDPA, there is a double dose of

28  deference that can rarely be surmounted.")

1          4.      Argument and Analysis

2          In the present petition, Petitioner claims that there was insufficient evidence to

3    support a finding that the enhancement for weapon use resulting in great bodily injury

4    was true because the evidence does not support that the victim's coma was a result of

5    the gunshot wound or the physical assault.

6          Petitioner does not challenge the fact that he and his co-defendants physically

7    assaulted and shot the victim. Petitioner's sole argument is that the attack was not the

8    cause of the victim's coma. He bases his argument on the notes of the treating physician

9    that state that in addition to the physical injuries to the victim, the victim was also

10   severely intoxicated.   (Traverse, ECF No. 27 at 18-24.) Petitioner asserts that the

11   evidence was not substantial enough to support the enhancement. (Id.) The Court

12   disagrees. The jury was presented with significant evidence of physical injury to the

13   victim, including a gunshot wound to the head just prior to the victim entering into a

14   coma. It is without question that any rational trier of fact would find the essential

15   elements of the crime beyond a reasonable doubt when the facts are viewed in the light

16   most favorable to the prosecution. Jackson, 443 U.S. at 319. Furthermore, under the

17   double deference standard of AEDPA, Petitioner has not made a sufficient showing that

18   the state court's decision was an unreasonable application of United States Supreme

19   Court authority. See Boyer v. Belleque, 659 F.3d  at 964. Accordingly, Petitioner is not

20   entitled to relief on this claim.

21        **B.     Claim Two: Jurors Observing Petitioner's Shackles During Trial**

22         Petitioner second claim is that his due process rights were violated when jurors

23   saw his shackles when he fell during trial and the court failed to take corrective action.

24   (Am. Pet., ECF No. 13 at 30-45.)

25         1.      State Decision

26         In the last reasoned decision denying Petitioner's claim, the appellate court

27   explained:

28

12

**II. Due process violation based on shackles**

Salgado's last challenge to the judgment is his claim that he was denied due process when the trial court refused to ask the jurors whether they saw Salgado in shackles. Salgado was shackled during trial, and although the shackles were hidden from the jury, on one occasion Salgado fell, briefly exposing his foot shackles. Salgado claims that it is possible one or more jurors could have seen the shackles when he fell.

Defense counsel brought the issue to the trial court's attention: "Your Honor, at the beginning of the proceedings after, I think, the break during the morning, my client fell. He had been shackled or they rigged something on his feet and he fell." The investigative detective confirmed that Salgado had fallen but stated that he had only seen "the end of it" but did not seen him fall. Defense counsel represented that when Salgado fell, "the jury, at least a few members from Juror Number 3 to Number 5 and from 9 to 11, had a clear view of him on the ground and they could see his shackles. So I think that the jury has to be asked if they saw that my client was in shackles or not. And if so, they have to be dismissed." The prosecution pointed out that the jury had heard a tape of a phone call that Salgado made while in jail and therefore already knew Salgado was in custody. Defense counsel stated that the trial court had never made a finding of necessity when Salgado was shackled. The court responded that defense counsel had never objected to the shackling and everything had been done to ensure that the jury did not see the shackles.

The court denied the request, stating, "Now, he fell, that's an accident. If in falling he exposed his own shackles, I have no control over that. You're presuming that the jury saw it. I'm not gonna go through that and ring the bell and create a problem, because in asking the questions I will prejudice the jury because I will make sure that they know that he's in shackles. I can't ask them of that."

First, we address Salgado's complaint that the court never made the requisite finding of necessity for shackling. A "defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints….' [Citation.]" (People v. Cox (1991) 53 Cal.3d 618, 651, fn. omitted, overruled on other grounds in People v. Doolin (2009) 45 Cal.4th 390, 421; see also People v. Miller (2009) 175 Cal.App.4th 1109, 1118.) "[D]ue process does not permit the use of visible restraints if the trial court has not taken account of the circumstances of the particular case." (Deck v. Missouri (2005) 544 U.S. 622, 630-631, 632.) However, it is also well settled "that the use of physical restraints in the trial court cannot be challenged for the first time on appeal." (People v. Tuilaepa (1992) 4 Cal.4th 569, 583; see also People v. McDaniel (2008) 159 Cal.App.4th 736, 743.) A defendant must make an appropriate and timely objection to his shackling. (People v. Tuilaepa, supra, at p. 583.)

We do not deem defense counsel's comment that no necessity finding had been made as an objection to the lack of a necessity finding. When the trial court commented that there had been no objection to the shackling, defense counsel dropped the matter and did not ask for a finding of necessity. The failure to make a request and obtain a ruling is fatal to Salgado's claim. Possible theories not fully developed in the trial

court cannot create a triable issue on appeal. (<u>Artiglio v. General Electric Co.</u> (1998) 61 Cal.App.4th 830, 842.)

Even if we were to consider this a proper objection, it came too late in the trial to be considered timely--on the fifth day of a six-day trial. We reject Salgado's assertion, without legal authority, that defense counsel need only object when he perceived that the restraints were prejudicial to Salgado. The legal objection to the use of restraints is based not only on the possible effect restraints may have on juror perceptions, but also on the affront to human dignity, disrespect for the entire judicial system, and the impact restraints may have upon a defendant's decision to take the stand in his or her own defense. (<u>People v. Duran</u> (1976) 16 Cal.3d 282, 290.) The legal basis for the objection arises at the start of trial. Salgado has forfeited any claim that the shackling was not supported by manifest necessity.

The next issue we must resolve is whether the trial court erred in refusing to ask the jurors whether they saw Salgado's restraints. In the absence of evidence that any juror actually saw the restraints when Salgado briefly fell, asking them about it would only ensure that the jurors knew Salgado was in restraints. Salgado argues that the court could have asked whether the jurors observed the fall, or other less-precise questions, but this is not what counsel asked the court to do. Counsel said, "I think that the jury has to be asked if they saw that my client was in shackles or not." In any event, Salgado has failed to make an adequate record that the jury saw the shackles or that Salgado was prejudiced as a result.

Defense counsel represented that the fall occurred at the start of proceedings after a break, yet the court, the investigative officer, and the prosecution apparently did not see Salgado fall. As a result, it is unclear whether court was actually in session. Defense counsel told the court that Salgado fell "immediately to the right of this table, the jury, at least a few members from Juror Number 3 to Number 5 and from 9 to 11, had a clear view of him on the ground and they could see his shackles." The record, however, does not say whether all of the jurors were in the box, sitting or standing, and whether there was any sound associated with the fall. The record does not even establish whether Salgado was in traditional shackles or some other type of restraint. Counsel does not state where he was standing at the time of the fall or how he knew that some of the jurors could see the shackles. There is no evidence why or how Salgado was moving about in the courtroom at a time when the court, the prosecution, and the investigative detective would not see Salgado fall, but jurors possibly did. It is Salgado's burden to provide an adequate appellate record and he has not done so. (<u>Maria P. v. Riles</u> (1987) 43 Cal.3d 1281, 1295-1296 [failure to provide adequate record requires that issue be resolved against appellant].)

Further, having the court inquire into whether anyone saw the shackles was not the only way for Salgado to make his record. He could have sought juror affidavits posttrial establishing that one or more jurors saw Salgado's restraints and the impact, if any, on the verdict. Courts have consistently held that courtroom shackling, even if error, was harmless if there is no evidence that the jury saw the restraints, or that the shackles impaired or prejudiced the defendant's right to testify or participate in his defense. (<u>E.g.</u>, <u>People v. Coddington</u> (2000) 23 Cal.4th

529, 650-651; <u>People v. Majors</u> (1998) 18 Cal.4th 385, 406; <u>People v. Tuilaepa</u>, supra, 4 Cal.4th at p. 584; <u>People v. Cox</u>, supra, 53 Cal.3d at pp. 652-653.) At this point, Salgado's claim that jurors might have seen his shackles is speculative, and there is no evidence the shackles in any way impaired or prejudiced Salgado's right to testify or participate in his defense. (<u>See</u> <u>People v. Pride</u> (1992) 3 Cal.4th 195, 233 [rejecting defendant's claim that shackling violated his constitutional rights because his assertion that jury saw his shackles was "speculative"].) On this record, we must reject Salgado's claim of error. (<u>Reyes v. Kosha</u> (1998) 65 Cal.App.4th 451, 466, fn. 6 [it is appellant's duty to affirmatively demonstrate trial error].) Since the record is inadequate to evaluate the possibility that some jurors saw the shackles, we need not evaluate Salgado's claim of prejudice.

<u>People v. Salgado</u>, 2010 Cal. App. Unpub. LEXIS 9538 at 13-20.

2.     Procedural Default

The state court, in denying Petitioner's claim asserted that he failed to timely raise the issue of the shackling as it was first mentioned on day five of a six day trial. Further the state court found that Petitioner's comment that no necessity finding was made did not serve as an objection for failing to have a necessity hearing. The state court denied the claim on the ground that under California law failure to object to shackling waives the claim. California law is, indeed, clear on that point. <u>See</u> <u>People v. Marks</u>, 31 Cal. 4th 197, 224 (2003) (citing <u>People v. Duran</u>, 16 Cal. 3d 282, 289 (1976). Because Petitioner "defaulted his federal claim[] in state court pursuant to an independent and adequate state procedural rule," this Court is precluded from reviewing it unless he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991). Petitioner has not set forth any arguments supporting cause and prejudice. Regardless, despite the fact that the claim is procedurally defaulted, the Court shall address the merits of the claim.

3.     Legal Standard

The Sixth and Fourteenth Amendments to the United States Constitution assure a criminal defendant the right to a fair trial. <u>See</u> <u>Estelle v. Williams</u>, 425 U.S. 501, 503 (1976). Visible shackling of a criminal defendant during trial "undermines the

1    presumption of innocence and the related fairness of the factfinding process" and

2    "'affront[s]' the 'dignity and decorum of judicial proceedings that the judge is seeking to

3    uphold.'" Deck v. Missouri, 544 U.S. 622, 630-31 (2005) (quoting Illinois v. Allen, 397

4    U.S. 337, 344 (1970)). See also Larson v. Palmateer, 515 F.3d 1057, 1062 (9th Cir.

5    2008). The Supreme Court has therefore held that "the Fifth and Fourteenth

6    Amendments prohibit the use of physical restraints visible to the jury absent a trial court

7    determination, in the exercise of its discretion, that they are justified by a state interest

8    specific to a particular trial." Deck, 544 U.S. at 629. Those interests include "physical

9    security," "courtroom decorum" and "courtroom security." Id. at 624, 628. Accordingly,

10   criminal defendants have "the right to be free of shackles and handcuffs in the presence

11   of the jury, unless shackling is justified by an essential state interest." Ghent v.

12   Woodford, 279 F.3d 1121, 1132 (9th Cir. 2002). See also Jones v. Meyer, 899 F.2d 883,

13   884 (9th Cir. 1990); Wilson v. McCarthy, 770 F.2d 1482, 1484 (9th Cir. 1985).

14       Shackling is not unconstitutionally prejudicial per se. Illinois v. Allen, 397 U.S. at

15   343-44; Duckett v. Godinez, 67 F.3d 734, 748 (9th Cir. 1995) ("shackling is inherently

16   prejudicial, but it is not per se unconstitutional"). Unjustified shackling does not rise to

17   the level of constitutional error unless the defendant makes a showing that he suffered

18   prejudice as a result. Ghent, 279 F.3d at 1132 (citing United States v. Olano, 62 F.3d

19   1180, 1190 (9th Cir 1995) and United States v. Halliburton, 870 F.2d 557, 561-62) (9th

20   Cir. 1989.). See also Larson, 515 F.3d at 1064 (state trial court's violation of the

21   petitioner's due process rights in requiring him to wear security leg brace during trial,

22   found to be harmless). The Ninth Circuit has held that "the greater the intensity of

23   shackling and the chains' visibility to the jurors, the greater the extent of prejudice."

24   Spain v. Rushen, 883 F.2d 712, 722 (9th Cir. 1989). Thus, it has been recognized that

25   "physical restraints such as a waist chain, leg irons or handcuffs may create a more

26   prejudicial appearance than more unobtrusive forms of restraint." Larson, 515 F.3d at

27   1064.

28       In Larson v. Palmateer, 515 F.3d 1057 (9th Cir. 2008), the jury saw the

1  defendant's leg shackles, and, when the shackles were removed in the midst of the trial,

2  the Court commented to the jury that the defendant had previously been wearing the

3  shackle for security reasons, and he would no longer be wearing it, due to a leg

4  impairment of the defendant. Id. at 1062. Because the record reflected no justification for

5  the visible leg shackle to be used during the first two days of trial, the Ninth Circuit

6  agreed that the defendant's "due process rights were violated when the trial court failed

7  to make a finding on the record justifying the necessity of physical restraints. . . ." Id. at

8  1063. The Ninth Circuit went on to determine, however, that, based on the record, the

9  error did not have a substantial and injurious effect or influence in determining the jury's

10  verdict under the harmless error standard articulated in Brecht, 507 U.S. 619, 623, 113

11  S. Ct. 1710, 123 L. Ed. 2d 353 (1993).

12      Finally, in Ghent v. Woodford, 279 F.3d 1121 (9th Cir. 2002), issued before the

13  Supreme Court's decision in Deck, the Ninth Circuit determined that, "[i]n order for a

14  defendant to prevail on a claim of this nature, a court must find that the defendant was

15  indeed physically restrained in the presence of the jury, that the shackling was seen by

16  the jury, and that the physical restraint was not justified by state interests." Id. at 1132. In

17  addition, the defendant must show prejudice (harmful error). Id.

18      After reviewing the evidentiary hearing transcript on appeal and considering the

19  arguments of the parties in Ghent, the United States Court of Appeals for the Ninth

20  Circuit determined:

21      The evidence suggests that a few jurors at most glimpsed Ghent in
        shackles in the hallway and as he was entering the courtroom. The jury's
22      "brief or inadvertent glimpse" of a shackled defendant is not inherently or
        presumptively prejudicial, nor has Ghent made a sufficient showing of
23      actual prejudice.

24  279 F.3d at 1133. See also Williams v. Woodford, 384 F.3d 567, 592 (9th Cir. 2002)

25  ("Even if we assume that Williams's physical restraints at trial were unjustified, we

26  conclude that the district court properly held that the error was harmless. When the jury

27  never saw the defendant's shackles in the courtroom, we have held that the shackles did

28  not prejudice the defendant's right to a fair trial.").

1    In a federal habeas corpus proceeding such as this one, the federal court must

2    determine whether any error had a "substantial and injurious effect" on the jury's verdict.

3    Brecht v. Abrahamson, 507 U.S. at 623; Larson, 515 F.3d at 1064. See also Fry v. Pliler,

4    551 U.S. 112, 121-22 (2007) (Brecht harmless error review applies whether or not the

5    state court recognized the error and reviewed it for harmlessness). In this context, a

6    federal habeas court is to "determine whether what [the jurors] saw was so inherently

7    prejudicial as to pose an unacceptable threat to defendant's right to a fair trial." Holbrook

8    v. Flynn, 475 U.S. 560, 572 (1986). In the Ninth Circuit, "only the most egregious kind of

9    shackling has been found . . . to deny due process." Castillo v. Stainer, 983 F.2d 145,

10   148 (9th Cir. 1991).

11            4.    Analysis

12   The state court, in denying Petitioner's claim, primarily relied on the lack of a

13   sufficient record to find that Petitioner was significantly disadvantaged by members of

14   the jury seeing his shackles, and alternatively, that the error was harmless. This Court, in

15   determining if the state court decision was reasonable, may only rely upon the record

16   before the state court. See Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011) ("We now

17   hold that review under § 2254(d)(1) is limited to the record that was before the state

18   court that adjudicated the claim on the merits.") Petitioner requests that this Court hold

19   an evidentiary hearing to determine the relevant facts. Such request is denied, as this

20   Court can only address new facts upon de novo review if it finds that the state court

21   decision was unreasonable. For the reasons described below, the Court finds that the

22   state court ruling was not an unreasonable determination of federal law.

23   On the record presented, and presuming Petitioner's allegations as true, it was

24   error for the trial court to shackle Petitioner without proper justification. However,

25   Petitioner is not entitled to relief unless he was prejudiced by the jurors witnessing his

26   shackles when he fell. See Brecht, 507 U.S. at 623; Larson, 515 F.3d at 1064. Petitioner

27   has not presented the court with any actual evidence of prejudice. Instead, Petitioner

28   argues that it was a close case, and jurors could have found one of Petitioner's co-

1   defendants to be the shooter, however, after seeing the shackles, the jurors may have

2   assumed that Petitioner was violent and therefore more likely to be the shooter. (See

3   Am. Pet., ECF No. 13 at 41-45.)

4          To determine whether the imposition of physical restraints constitutes prejudicial

5   error, the Ninth Circuit has "considered the appearance and visibility of the restraining

6   device, the nature of the crime with which the defendant was charged and the strength

7   of the state's evidence against the defendant." Larson, 515 F.3d at 1064; Walker v.

8   Martel, 709 F.3d 925, 942 (9th Cir. 2013). While it is not clear from the record how

9   Petitioner was shackled, the restraints were only made visible to the jury when Petitioner

10  fell. The restraints were not visible at other times, and even when Petitioner fell, the

11  event happened so quickly that a detective and the district attorney who were present in

12  the courtroom did not see the incident occur. Accordingly, the jury was only able to see

13  the shackles, if at all, for a very brief period of time. Furthermore, the evidence against

14  Petitioner was quite strong. The first victim of the assault that night, Gonzalez, identified

15  Petitioner as the man with the gun during his robbery. Further, Petitioner was found with

16  the Gonzalez's cell phone the next day. Another witness identified the clothing that the

17  assailants were wearing, and the car that they were driving, which were consistent with

18  that of the defendants. Finally, a co-defendant stated that even though he did not see

19  the shooting, he had seen Petitioner with a gun, and after the incident heard Petitioner

20  claim that the shooting was an accident. Petitioner attempts to argue that the identity of

21  the shooter left room for doubt, and therefore the error in allowing the jury to see him in

22  restraints was prejudicial. However, as described above, one of the victims identified him

23  as possessing and threatening him with a gun shortly before the shooting, and one of his

24  co-defendants gave corroborating testimony that he was in possession of the gun at the

25  time of the shooting. Therefore there was strong evidence from which the jury could infer

26  that he was the shooter. Petitioner has not made a sufficient showing that the jury briefly

27  seeing his shackles had an injurious effect on the verdict.

28          Given that the jury briefly saw Petitioner's restraints, if at all, and that the evidence

1  against him was strong, any error did not have a substantial and injurious impact on the

2  jury's verdict, and the appellate court's determination of this issue was not contrary to, or

3  an unreasonable application of, clearly established Supreme Court precedent. Habeas

4  corpus relief is foreclosed.

5  **IV.**   **RECOMMENDATION**

6      Accordingly, it is hereby recommended that the petition for a writ of habeas

7  corpus be DENIED with prejudice.

8      This Findings and Recommendation is submitted to the assigned District Judge,

9  pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within thirty (30) days after

10 being served with the Findings and Recommendation, any party may file written

11 objections with the Court and serve a copy on all parties. Such a document should be

12 captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply

13 to the objections shall be served and filed within fourteen (14) days after service of the

14 objections. The parties are advised that failure to file objections within the specified time

15 may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153

16 (9th Cir. 1991).

17

18

19

20

21

22 IT IS SO ORDERED.

23   Dated:   August 15, 2013        /s/ Michael J. Seng

24                    UNITED STATES MAGISTRATE JUDGE

25

26

27

28

20